UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


GGNSC CHESTNUT HILL LLC           )
d/b/a GOLDEN LIVING CENTER –      )
HEATHWOOD; GGNSC                  )
ADMINISTRATIVE SERVICES LLC;      )2
GOLDEN GATE NATIONAL SENIOR       )
CARE, LLC; GGNSC HOLDINGS         )
LLC,                             )
                                 )
        Plaintiffs,              )
                                 )        CIVIL ACTION
v.                               )        NO.16-10525-DPW
                                 )
JACKALYN M. SCHRADER, AS THE     )
PERSONAL REPRESENTATIVE OF       )
THE ESTATE OF EMMA J.            )
SCHRADER,                        )
                                 )
        Defendant.               )


FINDINGS OF FACT
AND
CONCLUSIONS OF LAW
March 31, 2018


Jackalyn Schrader, is the personal representative of her

mother's estate.  She brought a wrongful death action in state

court as a result of the death of her mother at a nursing home.

In response, the nursing home entities (collectively "GGNSC")[1]

---

[1] The GGNSC entities, the four Plaintiffs in this action,
are: GGNSC Chestnut Hill LLC d/b/a Golden Living Center
Heathwood, a limited liability company organized under the laws
of the State of Delaware with its principal place of business
located at 188 Florence Street, Chestnut Hill, Massachusetts,
doing business as Golden Living Center Heathwood, a long-term
care facility, within the meaning of 940 C.M.R. § 4.01, located
at 188 Florence Street in Chestnut Hill; GGNSC Administrative
Services, LLC, a management company for GGNSC Chestnut Hill LLC,
organized under the laws of the state of Delaware with its

brought this federal court action to compel Jackalyn Schrader to arbitrate the dispute pursuant to the Federal Arbitration Act.

## I. THE BROAD AND CONTESTED LEGAL LANDSCAPE

This case is an example of the many skirmishes that continue along the recently intensifying - but wavering - battle line between those who support resolution of disputes by arbitration and those who support resolution of disputes by conventional litigation.

There has historically been a strong public policy preference toward arbitration both federally and in the state of Massachusetts. *See Mastrobuono* v. *Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995) (federal policy favoring arbitration) [Stevens, J]; *Miller* v. *Cotter*, 863 N.E.2d 544, 547 (2007) (Massachusetts policy favoring arbitration). So long as arbitration agreements are not invalidated through contract defenses, such as fraud, duress, or unconscionability, they have generally been viewed as valid in the nursing home context. *See Miller*, 863 N.E.2d at 544.

---

principal place of business in Texas; Golden Gate National Senior Care, LLC, a management company for GGNSC Chestnut Hill LLC, organized under the laws of the state of Delaware with its principal place of business in Texas; and GGNSC Holdings LLC, also a Delaware company with its principal place of business in Texas. GGNSC Chestnut Hill LLC is a subsidiary of and directly owned by GGNSC Holdings LLC.

Nevertheless, a contrary public policy view has asserted itself in some state courts and then has been rejected by the Supreme Court of the United States. *See, e.g., Extendicare Homes, Inc.* v. *Whisman*, 478 S.W.3d 306 (Ky. 2015) *rev'd sub nom. Kindred Nursing Center, Ltd.* v. *Clark*, 137 S. Ct. 1421 (2017); *Brown* v. *Genesis Healthcare Corp.*, 724 S.E.2d 250 (W.Va. 2011) *rev'd sub nom. Marmet Health Care Center, Inc.* v. *Brown*, 565 U.S. 530, 132 S.Ct 1201 (2012) (per curiam).

In 2016, during the last year of the Obama administration, the most concerned federal administrative agency rejected arbitration agreements in the nursing home context when the Department of Health and Human Services Center for Medicare and Medicaid Services ("CMS") issued a new rule (the "2016 Rule") effective November 28, 2016, prohibiting Medicare and Medicaid-participating long-term care facilities from entering "into pre-dispute binding arbitration agreements with their residents or their representatives." 81 Fed. Reg., 68800 (October 4, 2016) (to be codified at 42 C.F.R. § 483.70(n)). By terms, that new rule, however, did not apply retroactively, and CMS made clear that it would "not have any effect on existing arbitration agreements or render them unenforceable." *Id.* Ultimately, I need not weigh in on the validity of the CMS rule because I am examining an agreement that was signed in 2013, well before this rule was enacted. It is sufficient for purposes of the matter

3

before me to observe that the CMS rule is not to be applied
retroactively.

Moreover, enforcement of the 2016 Rule has been enjoined
and the new Trump administration has proposed a newer rule to
replace it. Shortly before the effective date of the 2016 Rule,
Judge Mills in the Northern District of Mississippi entered a
preliminary injunction barring its enforcement. *Am.Health Care
Ass'n* v. *Burwell*, 217 F. Supp. 3d 921 (N.D. Miss. 2016). While
the government had appealed this decision to the United States
Court of Appeals for the Fifth Circuit in the waning days of the
Obama administration, *see Am.Health Care Ass'n* v. *Price*, appeal
docketed *sub nom. Am.Health Care Ass'n* v. *Burwell*, No. 17-60005
(5th Cir. Jan. 6, 2017), the new administration published a
proposed revised rule reversing the 2016 Rule banning nursing
home arbitration, 82 Fed. Reg. 26649 (June 8, 2017), 2017 WL
2462165, and coincidentally moved to dismiss its appeal of Judge
Mills's injunction. *Am. Health Ass'n* v. *Price*, No. 17-60005
(5th Cir. Jun. 2, 2017).

Prescinding from discussion of the resolution of the
arbitration question as a categorical matter at the highest
judicial and executive levels, I must also note that even within
regimes where the general applicability of a policy favoring
arbitration is acknowledged, or at least finally acquiesced in,
hand to hand combat over the conditions precedent can be a proxy

for the broader controversy regarding the public policy of

dispute resolution by arbitration.[2]  Thus, here, Jackalyn

---

[2] I note that the state courts to which remands were directed by
the Supreme Court of the United States seem prepared to rely on
alternative contractual defense grounds to bar arbitration when
a categorical bar to arbitration is found violative of the
Federal Arbitration Act.  In the *Kindred Nursing Center*
litigation, involving consolidation of two cases, the Supreme
Court of the United States remanded only one of the two cases.
*Kindred Nursing Center, Ltd.* v. *Clark*, 137 S.Ct. 1421, 1429
(2017).  As to the Clark estate, the Supreme Court reversed the
Kentucky Supreme Court's judgment, ruling that "the court must
now enforce the Clark-Kindred arbitration agreement," because
the decision of the Kentucky Supreme Court "was based
exclusively on the clear-statement rule that . . . violates the
FAA."  *Id*.  As to the Wellner estate, the Supreme Court was
"uncertain as to whether . . . an impermissible taint" in the
form of the clear-statement rule influencing the way in which
the Kentucky Supreme Court interpreted the *Wellner* power of
attorney (as insufficiently broad to give Beverly the authority
to execute an arbitration agreement for Joe).  *Id.* The Supreme
Court made clear that "[i]f that interpretation of the document
is wholly independent of the . . . clear-statement rule, then
nothing we have said disturbs it."  *Id.*  Therefore, the court
was instructed on remand to "determine whether it adheres, in
the absence of the clear-statement rule, to its prior reading of
the *Wellner* power of attorney."  *Id.*
   On remand, in *Wellner*, the Kentucky Supreme Court held that
their prior decision should remain undisturbed because it had
not been "tainted" by the clear-statement rule.  *See Kindred
Nursing Center, Ltd.* v. *Wellner*, 533 S.W.3d 189, petition for
*certiorari filed*, No. 17-1318 (U.S. Mar. 20, 2018).
   In the *Brown* litigation, the Supreme Court of the United
States, remanded three consolidated cases, *Marmet Health Care
Center, Inc.* v. *Brown*, 565 U.S. 530, 534, 132 S.Ct. 1201, 1204
(2012) (per curiam). Family members of patients in those cases
signed arbitration agreements with the nursing home on behalf of
the patients.  Each contract included a clause requiring the
parties to arbitrate all disputes.  West Virginia's Supreme
Court of Appeals held that "as a matter of public policy under
West Virginia law, an arbitration clause in a nursing home
admission agreement adopted prior to an occurrence of negligence
that results in a personal injury or wrongful death, shall not
be enforced to compel arbitration of a dispute concerning the

Schrader declined to concede that a valid agreement to arbitrate was formed as a matter of general contract law.  Given the factual dispute about contract formation, I have found it necessary to act as factfinder on the question.  The following Findings of Fact and Conclusions of Law set forth my determination that a valid agreement was formed and that Jackalyn Schrader must be compelled to arbitrate her claims against GGNSC.

## II. FINDINGS OF FACT

On February 4, 2013, Jackalyn Schrader's mother, Emma Schrader ("Ms. Schrader") was transferred by ambulance and admitted to Golden Living Center Heathwood (hereinafter

---

negligence."  565 U.S. at 532.  The West Virginia court "concluded that the FAA does not pre-empt the state public policy."  *Id.*  Because the West Virginia court proposed an "alternative holding that the particular arbitration clauses . . . were unconscionable," the Supreme Court of the United States remanded the case.  *Id.* at 533-34.  In particular, it was "unclear . . . to what degree the state court's alternative holding was influenced by the invalid, categorical rule . . . against predispute arbitration agreements."  *Id.* at 534.  Thus, the Supreme Court directed the West Virginia court to consider on remand whether "absent that general public policy, the arbitration clauses . . . are unenforceable under state common law principles that are not specific to arbitration and pre-empted by the FAA."  *Id.*

On remand, the West Virginia Supreme Court of Appeals reversed the two trial court orders compelling arbitration and permitted the parties to raise and develop their arguments regarding unconscionability anew before the trial court.  *Brown* v. *Genesis Healthcare Corp.*, 729 S.E.2d 217, 223 (W.Va. 2012).  There have been no reported decisions in that litigation since then.

"Heathwood") in Chestnut Hill.  Ms. Schrader began receiving
care that day at Heathwood.  Aside from the Consent to Treat
document, which authorized the nursing staff to commence
treatment, no paperwork or agreements were completed in order
for Ms. Schrader to be admitted and begin receiving care at
Heathwood.

Katelyn LaTouf was the Administration Coordinator at the
time of Ms. Schrader's admittance to Heathwood.  She was
responsible for completing admissions paperwork with new
patients.  As a matter of custom and practice, Ms. LaTouf would
present new residents with a package or booklet of information
and agreements (apart from the Consent to Treat, which was
executed with the nursing staff).  Ms. LaTouf has no specific
memory of meeting Emma or Jackalyn Schrader or providing them
with the paperwork now in dispute.  While Ms. LaTouf usually
discussed the paperwork with patients and their representatives,
if a patient had a representative who was unable to sign
paperwork at the time of admittance at Heathwood, it was Ms.
LaTouf's practice either to mail the paperwork to the
representative or to leave it for the representative to complete
at a later time.  It was Ms. LaTouf's general practice to allow
the families of newly admitted patients to take the package of
agreements, including the arbitration agreement, home to
consider and have legal counsel review if they wished.  However,

on February 4, 2013, after Ms. Schrader was admitted to
Heathwood, Jackalyn Schrader signed a document describing Ms.
Schrader's "Inventory of Personal Possessions."

As part of her duties as a member of the nursing staff,
Vanessa Desesa, RN, made a progress note in Emma Schrader's file
on February 11, 2013 at 15:30, which stated, in part: "daughter
will be in to sign paperwork and be present for Ativan trial."
Jackalyn Schrader signed three documents on February 11, 2013,
including: a DNR Order, a No CPR Order, and a Consent to
Withhold CPR.  Jackalyn Schrader completed additional documents
on February 14, 2013.  She signed the Admissions Agreement on
February 19, 2013.  In addition to the Admissions Agreement,
Jackalyn Schrader signed four other documents on February 19,
2013.  On February 27, 2013, Jackalyn Schrader signed six
documents.

Three signed documents, including the Arbitration
Agreement, were left undated.  Ms. LaTouf testified that she
signed the Arbitration Agreement on February 11, 2013 and does
not recall personally seeing Jackalyn Schrader sign the
agreement.

Jackalyn Schrader testified that the signature on the
Durable Power of Attorney document appeared to be hers; the
signature on the Admissions Agreement appeared to be hers; the
signature on the Arbitration Agreement appeared to be hers; the

signature on the Acknowledgement of Receipt of the Department of
Public Health Brochure appeared to be hers; the signature on the
Authorization for Assignment of Insurance Benefits appeared to
be hers; the signature on the Acknowledgment Page Regarding
Valuables appeared to be hers; and the signature on the Mass
Health Application appeared to be hers. Jackalyn Schrader
testified that it was her common practice to sign paperwork in
blue ink. The documents presented to Jackalyn Schrader as
initially offered during her testimony were black and white
copies, and she stated that she could not verify her signatures
unless she saw them in blue ink. In viewing the original and/or
color copied versions submitted thereafter that Jackalyn
Schrader signed, I find that she signed the following documents
in blue ink: the Arbitration Agreement; Acknowledgement of
Receipt of the Department of Public Health Brochure); Admission
Agreement (dated 2/19/13); Authorization for Assignment of
Insurance Benefits (dated 2/19/13); and Document Opening an RFMS
Banking Account (dated 2/19/13).

   Ms. LaTouf testified that there was no requirement to sign
the Arbitration Agreement for continued care at Heathwood. The
Arbitration Agreement contained a signature line to accept the
agreement and a separate signature line to decline the
agreement. Nevertheless, although there was an option to either
accept or decline the Arbitration Agreement, Ms. LaTouf only

highlighted below the signature line that indicated acceptance of the agreement.

Near the top of the first page of the Arbitration Agreement, in bold capital letters, the Arbitration Agreement, states: "This agreement is <u>not</u> a condition of admission or continued residency in the facility" (emphasis in original). On the top of the signature page of the Arbitration Agreement, the Agreement states in bold capital letters: "His [sic] agreement governs important legal rights. Please read it carefully and in its entirety before signing."

### III. CONCLUSIONS OF LAW

The Federal Arbitration Act provides that:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. Healthcare, and specifically a transaction in which an individual is admitted to a nursing home, is a commercial activity to which the federal law applies. *Miller*, 863 N.E.2d at 544.

In determining whether a motion to compel arbitration should be granted, a court must determine whether "(i) there

exists a written agreement to arbitrate, (ii) the dispute falls within the scope of that arbitration agreement, and (iii) the party seeking an arbitral forum has not waived its right to arbitration." *Gove* v. *Career Sys. Dev. Corp.*, 689 F.3d 1, 4 (1st Cir. 2012) (quoting *Combined Energies* v. *CCI, Inc.*, 514 F.3d 168, 171 (1st Cir. 2008)). "[A]rbitration is a matter of contract" and "principles of state contract law control the determination of whether a valid agreement to arbitrate exists." *Id.* at 3 (citations and internal quotation marks omitted). Thus, arbitration agreements can be "invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'" *Bekele* v. *Lyft, Inc.*, 199 F. Supp. 3d 284, 292 (D. Mass. 2016) [Saylor, J.] (quoting *AT&T Mobility LLC* v. *Concepcion*, 563 U.S. 333, 339 131 S. Ct. 1740 (2011)).

## A. *Validity*

I first consider whether there is a written agreement to arbitrate. *See id.* at 294. Under Massachusetts law, in order to have a valid contract there must be an offer, acceptance, and consideration. *Id.* "Formation of a contract is judged by the objective conduct of the parties, rather than their subjective intent." *Id.* (citing *Brewster Wallcovering Co.* v. *Blue Mountain Wallcovering, Inc.*, 864 N.E.2d 518, 532 n.35 (Mass. App. Ct. 2007)). Jackalyn Schrader argues that there is no valid contractual agreement because there was no "meeting of the

11

minds," meaning that significant, material terms were still being negotiated, *Situation Mgmt. Sys., Inc.* v. *Malouf, Inc.*, 724 N.E.2d 699, 703 (Mass. 2000) [Ireland, J], because she did not fully execute the agreement. I disagree.

Jackalyn Schrader was provided a packet of paperwork, which included an Arbitration Agreement that she was free to reject or accept. I find that the Arbitration Agreement's signature page was provided to Jackalyn Schrader along with the entire agreement in a package of paperwork. I find further that the signature that appears on the original Arbitration Agreement, in blue ink, is that of Jackalyn Schrader. Under the circumstances, absent fraud which I do not find, Jackalyn Schrader's suggestion of failure to read or understand the agreement given to her, "does not free [her] from its obligations." *Miller*, 863 N.E.2d at 545. In sum, there is no evidence that Jackalyn Schrader did not assent to the terms of the Arbitration Agreement that she signed. Thus, a valid contractual agreement to arbitrate exists.

**B.  *Unconscionability***

Jackalyn Schrader contends that even if a valid agreement exists, the contract is invalid because it is unconscionable. Unconscionability is determined on a case by case basis, and courts must pay particular attention to "whether, at the time of the execution of the agreement, the contract provision could

result in unfair surprise and was oppressive to the allegedly disadvantaged party." *Miller*, 863 N.E.2d at 545. Unconscionability is a question of law, which must be determined based on the setting, purpose, and effect of the contract. *Id.* at 537.

At the outset, I consider whether the contract was procedurally unconscionable. Procedural unconscionability is present when the "circumstances surrounding the formation of the contract show that the aggrieved party had no meaningful choice and was subject to unfair surprise." *Barrasso* v. *Macy's Retail Holdings, Inc.*, 2016 WL 1449567, at *5 (D. Mass. Apr. 12, 2016). In *Licata* v. *GGNSC Malden Dexter LLC*, the plaintiff argued that the arbitration agreement at issue was unconscionable "because it was executed at a late hour, by an unsophisticated individual, under circumstances where the parties had unequal bargaining power, and he was compelled to sign based on his mother's need for treatment." No. SUCV2011-02815-A, 2012 WL 1414881, at *4 (Mass. Super. Mar. 14, 2012), *aff'd*, 2 N.E.3d 840 (Mass. 2014). Despite those circumstances, the *Licata* court found that the agreement was not unconscionable because there was no evidence of undue influence to sign the agreement, the agreement clearly indicated that it was not mandatory and should be read carefully, and there was a 30-day revocation period. *Id.*

The arbitration agreement given to Jackalyn Schrader clearly indicated in bold-face capital letters that the agreement was not mandatory for continued care; the agreement also prominently stated at the top of the signature page that the entire agreement should be read carefully.  Furthermore, the agreement provided a 30-day revocation period in which Jackalyn Schrader could have sent written notice of her wish to revoke acceptance of the agreement.  Ms. LaTouf's action of highlighting only one of the signature lines did not amount to undue influence, especially in light of the fact that the agreement was not mandatory and was revocable.  Jackalyn Schrader also argues that the agreement was unconscionable because it was not explained to her.  This argument fails because there is no duty to explain the terms of a written contract to the other party in an arms-length transaction.  *Sec. Indus. Ass'n* v. *Connolly*, 703 F. Supp. 146, n. 10 (D. Mass. 1988), *aff'd*, 883 F.2d 1114 (1st Cir. 1989).  Overall, the admissions process here does not indicate unfairness or lack of meaningful choice.  *See Miller*, 863 N.E.2d at 546 ("[N]othing in the circumstances of an ordinary admission to a nursing home . . . would suggest unfairness or oppression necessary to support a claim of procedural unconscionability.").

While Jackalyn Schrader makes no compelling substantive unconscionability argument, in the interests of completeness, I

briefly consider whether the arbitration agreement is substantively unconscionable.  A contract with terms that are "oppressive to one party" is substantively unconscionable. *Barrasso*, 2016 WL 1449567, at *5.

The Supreme Judicial Court in *Miller* considered whether an arbitration agreement signed by the plaintiff there on behalf of his father, who had been admitted to a nursing home, was unconscionable.  863 N.E.2d at 545.  In determining that the agreement was not substantively unconscionable, the SJC focused on the fact that the agreement was "bilateral in that either party could invoke its provisions" and that the plaintiff "had a unilateral right of recision for thirty days after execution of the agreement."  *Id.*  Based on these touchstones, the agreement at issue is not substantively unconscionable.  The agreement here is bilateral because both parties are bound to arbitration. Jackalyn Schrader had the right to rescind the arbitration agreement within 30 days of signing.  There is no evidence of substantive unconscionability with regard to the arbitration agreement in question.

## C.   *Arbitrability of Wrongful Death Claims*

Finally, I consider whether Jackalyn Schrader's claims, as the executor of the estate, fall within the scope of the agreement.  The text of the Arbitration Agreement at issue states that the term "Resident" applies to "the Resident, all

persons whose claim is or may be derived through or on behalf of the Resident, including any next of kin, guardian, executor, administrator, legal representative, or heir of the Resident, and any person who has executed this Agreement on the Resident's behalf." Jackalyn Schrader contends that even if the arbitration agreement is valid, and despite the language in the agreement that binds executors and those who derive their claims on behalf of the resident, this wrongful death claim cannot be arbitrated because wrongful death beneficiaries are not parties to the Arbitration Agreement. GGNSC contends by contrast that the Defendant's Massachusetts wrongful death claim is derivative of a claim that Ms. Schrader could have brought herself if she had survived, making the wrongful death beneficiary claims subject to arbitration.

In determining the scope of the agreement, I must apply ordinary state law principles governing the formation of contracts. *Grand Wireless, Inc.* v. *Verizon Wireless, Inc.*, 748 F.3d 1, 7 (1st Cir. 2014). While a contract cannot generally bind a non-party, there are exceptions under which a non-signatory may be bound. *Id.* at 9-10. As relevant here, the law with regard to whether beneficiaries in a wrongful death suit are bound by arbitration agreements that they did not sign is unsettled, with no uniformity among courts throughout the country. *Compare Bales* v. *Arbor Manor*, No. 4:08CV3072, 2008 WL

2660366, at *8 (D. Neb. July 3, 2008) ("Because of the derivative nature of a wrongful death action in Nebraska, I conclude that the arbitration must be enforced against the plaintiff to the same extent it would have been enforced against the plaintiff's decedent had he survived.") *with Golden Gate Nat'l Senior Care, LLC* v. *Beavens*, 123 F. Supp. 3d 619, 633-34 (E.D. Pa. 2015) (determining that "survival action" claims brought by the estate of the deceased "belong" to the decedent and pass to the estate by "the terms of the will or intestacy" and therefore fall within the scope of an arbitration agreement entered into by the deceased, but that wrongful death claims are "separate and distinct cause[s] of action from a survival action" and are not the deceased's causes of action such that "an arbitration agreement signed by the decedent or his or her authorized representative is not binding upon non-signatory wrongful death beneficiaries") [Stengel, J]. Accordingly, whether non-signatory beneficiaries of an estate are bound by an arbitration agreement entered into by the deceased turns on whether wrongful death claims in Massachusetts are considered derivative or independent.

As a starting point, I look to the only opinion discussing Massachusetts law I have found or been directed to that is directly on-point. In *Oahn Nguyen Chung* v. *StudentCity.com, Inc.*, No. CIV.A. 10-10943-RWZ, 2011 WL 4074297 (D. Mass. Sept.

9, 2011), the parents of a student who died in a boating accident while attending a trip organized by StudentCity, sued for wrongful death as executors of their child's estate.  My colleague, Judge Zobel, then considered whether the decedent's consent to arbitration foreclosed the executors of the estate from bringing a wrongful death claim on behalf of the statutorily designated beneficiaries.  *Id.*  Judge Zobel decided that while the student had signed an arbitration agreement prior to attending the trip, the student's parents were not bound by the arbitration agreement because "wrongful death is not derivative of the decedent's claim," so "it would be inconsistent with fundamental tenets of contract law to nonetheless hold that those beneficiaries, who did not sign an arbitration agreement, are bound by the decision of the decedent, whose estate holds no interest in this claim."  *Id.*  On reconsideration, while declining to reverse that holding, she made clear that Massachusetts courts have not "squarely decided whether a Massachusetts wrongful death claim is covered by a decedent's arbitration agreement," and that "other jurisdictions are divided on the question."  *Oahn Nguyen Chung* v. *StudentCity.com*, Inc., No. CIV.A. 10-10943-RWZ, 2013 WL 504757, at *1 (D. Mass. Feb. 12, 2013); *see also Angelo* v. *USA Triathlon*, No. CIV.A. 13-12177-LTS, 2014 WL 4716195, at *3 (D. Mass. Sept. 19, 2014) (Sorokin, J) (agreeing with *Chung*, and

applying it in the context of an indemnity agreement).  I
respectfully disagree with the holding in *Chung* because the law
in Massachusetts has moved toward interpreting wrongful death
claims as derivative of the decedent's cause of action.

The Massachusetts Wrongful Death Statute provides that "a
person who (1) by his negligence causes the death of a person,
or (2) by willful, wanton or reckless act causes the death of a
person under such circumstances that the deceased could have
recovered damages for personal injuries if his death had not
resulted . . . shall be liable in damages." Mass. Gen. Laws
ch. 229, § 2.  At one time it was "undisputed that wrongful
death actions in Massachusetts were *independent*" of claims that
a decedent would have been able to bring had the decedent
survived.  *Ellis* v. *Ford Motor Co.*, 628 F. Supp. 849, 858 (D.
Mass. 1986) (emphasis added) (internal quotation marks omitted).

By the late 1980s, however, courts began acknowledging that
"various amendments made to the wrongful death statute beginning
in 1958 evidence the legislature's intention to overrule this
earlier view and to establish that a claim for wrongful death in
Massachusetts is derivative from and not independent of the
decedent's personal injury claim." *Id.*  More recently, in
interpreting the Massachusetts wrongful death statute, several
courts, including judges of my own, have agreed with the
proposition that "Massachusetts law specifies that claimants'

rights are necessarily derivative of the decedent because they

can only recover if the decedent died 'under such circumstances

that the deceased could have recovered damages for personal

injuries if his death had not resulted.'" *N. Assur. Co. of Am.*

v. *Wells*, No. CIV.A. 12-10238-DPW, 2013 WL 2250985, at *6 (D.

Mass. May 21, 2013); *Johnson* v. *Brown & Williamson Tobacco*

*Corp.*, 122 F. Supp. 2d 194, 209 (D. Mass. 2000) (one must assert

wrongful death claims on behalf of the decedent based upon

claims the decedent could have brought had the decedent

survived).[3]

Furthermore, Massachusetts law only allows one to bring a

wrongful death claim as the executor or administrator of the

decedent's estate, and there is no separate cause of action for

---

[3] While the phrase "under such circumstances that the deceased
could have recovered damages for personal injuries if his death
had not resulted" does not unambiguously modify wrongful death
actions brought under negligence, the First Circuit has held
that to prevail on a negligence claim in a wrongful death
context, a plaintiff must prove that the defendant owed the
decedent a duty of reasonable care, that the defendant breached
this duty, that damage resulted, and that there was a causal
relation between the breach of the duty and the damage.
*Cracchiolo* v. *E. Fisheries, Inc.*, 740 F.3d 64, 69 (1st Cir.
2014).  The elements in a wrongful death claim mirror the
elements necessary to prove negligence had the decedent
survived.  This effectively means that there would be no cause
of action unless the decedent could have sued had the decedent
survived. Therefore, wrongful death actions in Massachusetts,
even under negligence, must be understood to have been "brought
under circumstances that the deceased could have recovered for
damages for personal injuries if his death had not resulted,"
and are thereby derivative.

surviving family members.  Mass. Gen. Laws ch. 229, § 2.

("Damages under this section shall be recovered in an action of

tort by the executor or administrator of the deceased."); *see N.*

*Assur. Co. of Am.*, 2013 WL 2250985, at *6.  In other words,

unlike some states in which individuals may bring their own

wrongful death claims, Massachusetts does not "segregate the

right to recover for wrongful death by claimant." *N. Assur. Co.*

*of Am.,* 2013 WL 2250985, at *6.

Looking more broadly, in *Miller* v. *Cotter*, the SJC was

tasked with deciding whether to compel arbitration in a case

concerning a wrongful death suit brought by the son of a man who

died in a nursing home.  863 N.E.2d at 540-41.  While not

directly discussing the question of whether the son's wrongful

death claim was subject to the arbitration agreement, the court

granted the motion to compel arbitration.  *Id.* at 549.  This

evidences the SJC's effective, albeit less than fully

articulated acceptance of the proposition that, under

Massachusetts law, arbitration with respect to wrongful death

actions is not disallowed as a matter of law.

Looking to other jurisdictions, I recognize there is a

split among the courts on this question.  But I am of the view

that the weight of persuasive authority treats wrongful death

claims as derivative.  In Nebraska, for example, Judge Kopf

determined that "[b]ecause of the derivative nature of a

wrongful death action in Nebraska, I conclude that the arbitration agreement must be enforced against the plaintiff to the same extent that it would have been enforced against the plaintiff's decedent had he survived." *Bales*, 2008 WL 2660366, at *8. Notably, the Nebraska wrongful death statute contains language similar to the Massachusetts statute, prescribing that claims brought under their wrongful death statutes must be claims that would have entitled the deceased to maintain an action and recover damages. Neb. Rev. Stat. § 30-809; *Bales*, 2008 WL 2660366, at *8. Other state and federal courts have drawn the same conclusion regarding other state wrongful death provisions. *See e.g. In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 646 (Tex. 2009) (distinguishing wrongful death claim, which is a derivative cause of action, from loss of consortium claim, which is a separate and independent claim distinct from the underlying action); *Graves* v. *BP Am., Inc.*, 568 F.3d 221, 223 (5th Cir. 2009) (per curiam) (finding that a wrongful death cause of action was derivative of the decedent's rights under Texas law and therefore any suit brought by the decedent's beneficiaries was subject to the arbitration agreement between the decedent and his employer); *Briarcliff Nursing Home, Inc.* v. *Turcotte*, 894 So. 2d 661, 665 (Ala. 2004) (per curiam) (administrator of a decedent's estate stands in the shoes of the decedent and is bound by the powers and restrictions that the

decedent would have been held to, so the administrator is bound to arbitration provisions); *Wilkerson ex rel. Estate of Wilkerson* v. *Nelson*, 395 F. Supp. 2d 281, 288 (M.D.N.C. 2005) ("[W]rongful death actions exist if and only if the decedent could have maintained an action for negligence or some other misconduct if she had survived."); *Herbert* v. *Superior Court*, 215 Cal. Rptr. 477, 481 (Cal. Ct. App. 1985) [Hastings, J] (determining that it is illogical not to subject wrongful death beneficiaries to the arbitration agreement, in part, because it is "unrealistic to require the signatures of all the heirs since they are not even identified until the time of death.").

To be sure, other courts have denied motions to compel wrongful death claimants to arbitrate by holding that wrongful death claims "exist only for the benefit of the spouse, children and parents of the deceased," and the wrongful death action is not the "deceased's right of action." *Golden Gate Nat'l Senior Care, LLC*, 123 F. Supp. at 634. Similarly, in *Peters* v. *Columbus Steel Castings Co.*, the court decided that Ohio law requires the treatment of a wrongful death claim as an independent cause of action, separate from any claim that the decedent could have pursued if he had lived. 873 N.E.2d 1258 ¶ 18 (Ohio Ct. App. 2006).

I am persuaded that the Supreme Judicial Court of Massachusetts, if presented directly with the question, would

conclude that a wrongful death claim is a derivative claim as to which the decedent's representatives and beneficiaries would be bound by an agreement to arbitrate. Moreover, I must honor the consistent treatment by the Supreme Court of the United States of arguably special objections to arbitration contracts, in the nursing home context, where it repeatedly held in recent decisions that state laws that "impede[] the ability . . . to enter into arbitration agreements . . . flout[] the FAA's command to place those agreements on an equal footing with all other contracts." *Kindred*, 137 S. Ct. at 1429 (2017); *see also Marmet*, 565 U.S. at 533 ("[w]hen state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward: The conflicting rule is displaced by the FAA") (quoting *AT&T Mobility LLC*, 563 U.S. at 341) (internal quotation marks omitted).

A compelling argument can be made that treating arbitration agreements as without force in the wrongful death context has the indirect but practical effect of singling arbitration agreements out for special treatment.[4] A reading of

---

[4] Cases in the wake of *Marmet* declining to compel arbitration of nursing home arbitration agreements strike me as alternatively distinguishable, unpersuasive, or both. The parties in *Marmet* signed arbitration agreements on behalf of the decedents — as I have found Jackalyn Schrader did here on behalf of Ms. Schrader. Thus, a holding that *Marmet* is inapplicable because the nursing home patients signed the arbitration agreements themselves, *see Richmond Health Facilities* v. *Nichols*, 811 F.3d 192, 198 (6th

Massachusetts law that fails to accommodate this firm and current jurisprudence developed by the Supreme Court of the United States runs the risk of being in contravention of the Federal Arbitration Act. My reading of the Massachusetts wrongful death statute as derivative not only reflects my considered understanding of what the Supreme Judicial Court would rule if the issue came to it for resolution, it also avoids inconsistency with the Federal Arbitration Act.

## IV. DECLINING TO ENJOIN THE STATE PROCEEDING

GGNSC requests that upon a finding that there is a valid arbitration agreement covering all the Defendant's claims asserted in the state court proceeding, I enjoin the state court proceeding. The Anti-Injunction Act gives federal courts the authority to grant an injunction to stay proceedings in state court in very limited circumstances, including "where necessary in aid of [the federal court's] jurisdiction or to protect or effectuate [the federal court's] judgments." 28 U.S.C. § 2283.

---

Cir. 2016),is distinguishable. Moreover, a holding that restricting arbitration with respect to wrongful death beneficiaries does not amount to a categorical anti-arbitration rule but instead is merely fact specific application of principles of contract law. *Carter* v. *SSC Odin Operating Co., LLC*, 976 N.E.2d 344, 360 (Ill. 2012), is unpersuasive for the reasons I have outlined in the text above because it amounts to a practical, if indirect, singling out of arbitration agreements under the mask of an invocation of general principles of contract law.

The Fifth Circuit has considered whether a district court has the discretion to issue an order staying a related state court proceeding when it has determined that the claims must be submitted to arbitration and found that the Anti-Injunction Act did not bar an order compelling arbitration and enjoining litigation in state court "because it falls within the exception for injunctions necessary to protect or effectuate the district court's prior judgment." *Am. Family Life Assur. Co. of Columbus* v. *Biles*, 714 F.3d 887, 893 (5th Cir. 2013) (per curiam).

In the Sixth Circuit courts have also concluded that "an injunction issued concurrent with an order to compel arbitration falls into the exception 'to protect or effectuate [the Court's] judgments.'" *GGNSC Louisville St. Matthews* v. *Madison*, 254 F. Supp. 3d 901, 912 (W.D. Ky. 2017) (quoting *Great Earth Cos.* v. *Simons*, 288 F.3d 878, 894 (6th Cir. 2002)) [Russell, J.].

Courts in the Third Circuit have come to similar conclusions with regard to the Anti-Injunction Act and in granting motions to compel arbitration have enjoined state court proceedings as "necessary in aid of [their] jurisdiction" when they issue orders to compel arbitration. *See, e.g., GGNSC Camp Hill West Shore, LP* v. *Thompson ex rel. Mullen*, No. 1:15-CV-445, 2015 WL 1932330, at *6 (M.D. Pa. Apr. 28, 2015); *Golden Gate Nat. Seniorcare LLC* v. *Lane*, No. 3:CV-14-1957, 2015 WL 926432, at *4 (M.D. Pa. Mar. 4, 2015).

While recognizing my power to do so, I do not find it necessary here to enjoin the parallel state proceeding in order to effectuate the judgment I will enter compelling arbitration. The parties have cooperated by entering into a stipulation deferring to this court's resolution of the motion to compel arbitration.  That resolution will be res judicata as between the parties and so no further disparate treatment of the issue can be anticipated in state court where presumably the parallel case may now be dismissed as moot.

I share the view suggested by Professor Sternlight that "the argument that federal courts should be allowed to enjoin state courts in order to support arbitration is at its strongest where it is clear that action taken, or perhaps about to be taken, by the state court will flout the FAA." Jean R. Sternlight, *Forum Shopping For Arbitration Decisions: Federal Courts' Use of Antisuit Injunctions Against State Courts*, 147 U. PA. L. REV. 91, 115 (1998).  Precisely the opposite is clear here and there is no showing of any potential for interference by the state court with this court's determination of the arbitrability issue. Consequently, an injunction against the state court proceeding is unnecessary.

## V. CONCLUSION

Judge Mills in a lengthy set of observations at the outset of his analysis in *Am. Health Care Ass'n*, 217 F. Supp. 3d at

926-29, concluded that "this court is unaware of any form of litigation which provides as effective a tool for pure delay, while not advancing the underlying litigation, as nursing home arbitration litigation." *Id*. at 928. The litigation before me illustrates the validity of those observations. Far from being an instrument for expeditious resolution of disputes, as arbitration is generally presented by its proponents, it is as a practical matter "a tool for delay" in the nursing home context because of the many opportunities to contest its predicates.

But in this context, practical considerations have not inflected the legal framework favoring arbitration agreements in the absence of a conventional contractual defense. Having engaged in lengthy fact finding regarding such defenses here, I conclude that no legal justification for avoiding arbitration is available.

For the foregoing reasons, I conclude that the arbitration agreement signed by Jackalyn Schrader, on behalf of Emma Schrader, must be enforced with respect to all claims. The motion [Dkt. No. 2] to compel is therefore granted. The Clerk is directed to enter final judgment in this matter to that effect.

*Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE